INHABITANTS OF PALMYRA *vs.* WAVERLY WOOLEN COMPANY.

Somerset.    Opinion July 9, 1904.

*Waters.   Mills.   Dams.   Bridge,* floated off by extraordinary freshet.
*R. S., c. 94,* §§ *1-2; 37-42.*

1.   Under the Mill Act, R. S., c. 94, the limitation, if any, imposed upon the height of a dam by a prior highway bridge above on the same stream is only that the dam shall not be so high as to injure the bridge at the usual and ordinary stages of the water throughout the year including the usual recurring and to-be-expected freshets at different seasons as they occur in a series of years.

2.   If a bridge is unfavorably affected by a dam below only in extraordinary and unusual freshets which occur but seldom in a long series of years, the dam is not of unlawful height as to the bridge.

3.   It is not necessary that a freshet be unprecedented, or higher than any preceding freshet within memory, to constitute it an extraordinary and unusual freshet within the above rule.

4.   In this case the prior bridge had stood uninjured by the dam below in all the freshets occurring for a decade, and was injured at last only in an extraordinary and unusual though not unprecedented freshet. The loss, therefore, must remain where it fell. The law does not shift it from the town upon the owner of the dam.

5.   The case does not seem to be within the "Mill Act" §§ 37-42, providing for cases of flowage of a highway by a dam. The road was not regularly or periodically overflowed.

Motion and exceptions by defendant.   Motion sustained.   Exceptions not considered.

Action on the case for negligence of defendant in building a dam at its mill in Pittsfield, across the Sebasticook River, so high that in the freshet of April, 1901, it raised the water and carried away a bridge in Palmyra on the same stream, to the damage of plaintiff. The verdict was for plaintiff for $1,751.51.

The case is stated in the opinion.

*Forrest Goodwin,* for plaintiff.

"One who builds a dam in a stream is bound to build and maintain it as reasonable men can foresee shall be necessary to meet the

ordinary contingencies and demands of nature, and cannot be held liable for those extraordinary visitations, whose comings could not have been anticipated or guarded, by the exercise of ordinary foresight." 13 Am. & Eng. Enc. of Law, 2nd ed. 696.

"Whether the flood was of such an extraordinary character as to relieve the defendants from liability, is a question of fact, to be determined by the jury, after proper instructions from the court." 13 Am. & Eng. Enc. of Law, 2nd ed. 696.

In *State* v. *Ousatonic Water Co.*, 51 Conn. 137, the court say, "When the defendants built their dam they were bound to know the habits and peculiarities of this river—what effects had been produced along its banks by its ordinary freshets in the spring of the year, when the ice breaks up; they were bound to notice the configuration of the shore, the contracted space at places for the waters of the river to pass, the formation of ice dams, and so far as science could reasonably discover, what would be the effect of a pond created by raising the water twenty-two feet above the natural flow of the stream at the place where the dam was erected, and they were bound to act in view of all these facts. The defendants were bound to provide against all the natural result of ordinary freshets in the river, whenever they might occur, and with whatever ordinary combination of circumstances they might be attended."

In *Gulf Ry. Co.* v. *Pomeroy*, 67 Texas, 501, where it appeared that a flood occurred in 1852, similar to the one occurring in 1885 and no flood intervened in the meanwhile, an action was founded on the injury caused by the flood in 1885. It was held that there was sufficient evidence to warrant the jury in finding that the 1885 flood might have reasonably been anticipated.

The jury found that reasonable, prudent men, in the exercise of ordinary prudence and common sense, would not have built a dam which raised the water so much at the bridge, and left it in that condition; and that, if they did do that, that they were not exercising reasonable prudence, such as the law requires; and they found that the sole cause of the destruction of the bridge was the dam built by the defendants.

*J. W. Manson and Geo. H. Morse,* for defendant.

The freshet was so much higher than any freshet that ever occurred on this river, that we are not bound to have anticipated it. *Lawler* v. *Baring Boom Co.,* 56 Maine, 443; *Topsham* v. *Lisbon,* 65 Maine, 449; *Smith* v. *Agawam Canal Co.,* 2 Allen, 355. Other dam owners above by their acts, after our dam had been built, changed the flow and condition of the stream so that it actually caused this bridge to go out, and we were not bound to have anticipated and guarded against these changes. Our dam was built with overflow and escape capacity enough to take care of all the water that could come to it in freshet times and was doing so. The water did not choke at the dam and retard the stream so as to cause this loss.

The injury was caused by a piece of ice formed where we had a right to flow, which was taken by the wind into the stream against this bridge and destroyed it. The defendant cannot be held liable for merely retarding the current without making every dam owner an insurer against all possible damage from high water.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, POWERS, PEABODY, SPEAR, JJ.

EMERY, J. From the evidence for the plaintiff and from the uncontradicted evidence for the defendant we find the following to be established as the material facts: —

In pursuance of its statutory duty the plaintiff town, Palmyra, about the year 1880 built a highway bridge in that town across the Sebasticook River, a stream not navigable. Afterward in 1891, at a point on the river three and one-eighth miles below this bridge, the defendant erected and has since maintained on its own land a dam across the river as authorized by the "Mill Act," R. S., chapter 94. This dam was about ten feet high above the bed of the river. With the water even with the top of the dam the level of the water ran out about a mile above the dam. With two and a half feet of water running over the dam the level ran out about two miles above the dam and one mile below the bridge. At this latter stage of the water the surface of the water at the bridge was ten inches higher

than at one mile below.   At a normal pitch of the water its surface under the bridge was some four feet below the lowest part of the bridge.   The flowage caused by the dam extended up the river for some distance above the bridge.

Through all the periodical freshets, spring, fall and winter for the ten years after the dam was built, from 1891 to 1901, no harm came to the bridge from freshets, the water not troubling it.   In April, 1901, however, there occurred on this river as on many other rivers in the State a very unusual freshet.   The like had not been known on that river since 1887 and had seldom occurred during the century, though the freshet of 1887 and perhaps one or two previous ones had been as high or even higher.   Though very unusual it was not unprecedented.   In this freshet of 1901 the water of the river rose suddenly and so high that at the bridge it reached the bottom of the structure, and the cakes of ice floating down struck the bridge and threw it down into the river.   There was no evidence that the defendant company did not exercise all due diligence to give the freshet free vent through the gates and waste ways of the dam. The only complaint was that the dam was too high.

Under these circumstances does the law shift the loss from the town to the owner of the dam, or does it leave the loss where it fell? The answer is to be found in a consideration of the limitations upon the right given by statute, R. S., ch. 94, to riparian owners upon streams not navigable to erect and maintain dams for the purpose of operating mills.   The right is given in the broadest terms with no limitation as to the height of the dam, except that it shall not be so high as to injure prior mills on the same stream.   *National Fibre Board Company* v. *Lewiston & Auburn Electric Light Company*, 95 Maine, 318, 321.   There is no such express prohibition in the statute against maintaining the dam so high as to injure prior bridges, and the question has been mooted whether such a prohibition is implied; whether, on the contrary, the town is not obliged to raise its bridges as water power is developed under the statute.

But, ignoring this question and conceding arguendo without deciding that the statutory right of the riparian owner to erect dams on his land for manufacturing purposes is limited to some extent by the

height of a prior bridge above on the same stream, we think the limitation as to height is only that the dam shall not be so high as to injure the bridge at the usual and ordinary stages of the water throughout the year, including the usual recurring and to-be-expected freshets at the different seasons as they occur in a series of years. *China* v. *Southwick,* 12 Maine, 238; *Smith* v. *Agawam Canal Co.,* 2 Allen, 355. If the production of water power must be so limited that low bridges will not be affected by extraordinary and unusual freshets which occur but seldom, a few in a century, the development of industries dependent upon, or facilitated by, water power will be often greatly hampered, if not absolutely prevented, to the great loss of the public.

Applying even this rule to the case at bar, the defendant company's dam was not an unlawful structure nor of unlawful height. The bridge was not injured by the highest water of any freshet for a decade. The freshet, in which it was carried away by the ice brought down by the current, was a very extraordinary one, caused by unusually heavy rains at the season of melting snows. This was to human ken a fortuitous and very infrequent combination of powerful natural causes, unusual and unexpected. The resulting loss must, therefore, remain where it fell.

It may be observed that this is not a case of regular flowage of a road by a dam. Nothing was regularly or periodically overflowed. Hence the case is not within the purview of those decisions maintaining actions by towns for flowing out the roads they were by statute obliged to maintain. Again, it is not a case where the dam must be lowered, or the road raised, in order to use and keep the latter open for travel. This is a case of a bridge only, and not only was the bridge not regularly or periodically overflowed by the dam, but it was not overflowed even at this unusual and unexpected juncture. The water simply rose so high under the bridge that cakes of floating ice struck the bridge and pushed it from its piers. The case, therefore, does not seem to be within sections 37 to 42 inclusive of the Mill Act, (ch. 94, R. S. of 1904) providing for cases of flowage of a highway.

*Motion sustained.    Verdict set aside.*