ELISHA BIGELOW, ADMR. OF EDMUND C. MORSE'S ESTATE *v.* TOWN OF ST. JOHNSBURY.

February Term, 1918.

Present: WATSON, C. J., HASELTON, POWERS, TAYLOR, and MILES, JJ.

Opinion filed November 8, 1918.

*Motion for Verdict—Insufficient Culvert—Question for Jury—
    Evidence—Does not Prove Negligence as Matter of Law—
    Operation of Automobile—G. L. 4705, 4709—G. L. 4617,
    4618—Notice to Town in Case of Death—Next of Kin—
    Construction of Statutes—Construction Leading to Absurd
    Consequence Avoided—Revision of Statutes—When not Regarded as Altering Law.*

In passing upon a defendant's motion for a directed verdict, the evidence must be considered in the light most favorable to the plaintiff.

In an action against a town for decedent's death, caused by the car he was driving tumbling over an alleged insufficient culvert, the question of the insufficiency of the culvert for lack of a railing or guard suitable to the place and condition, was for the jury.

Evidence that the decedent had said he might have to stop driving nights because, when he met a car, the reflection was so strong on the windshield that it reflected on his glasses and bothered him to see the road, does not prove, as matter of law, that he was negligent in driving his car at the time of the accident, particularly, when it did not appear that at that time his vision was so affected.

Evidence that after the accident the brakes of the decedent's car were found to be loose, does not prove, as matter or law, that at the time of the accident he violated P. S. 4094, as amended by No. 147, Acts of 1912 and No. 141, Acts of 1910 (G. L. 4705, 4709), in not providing his car with an adequate brake, and in approaching a curve without having his car under perfect control, in view of other evidence that he was then running slowly and had full control of his car.

P. S. 4031, 4032 (G. L. 4617, 4618), requiring one injured through the insufficiency of a bridge or culvert to give notice to the town, does not apply to persons financially injured through the death of their next of kin.

In considering a statute, an absurd purpose will not be attributed to the lawmakers, and a construction leading to an absurd consequence will always be avoided.

Changes in a revision of statute will not be regarded as altering the law, when it is settled by plain language in the statute or by judicial construction, unless it is clear that such was the intention.

ACTION OF TORT to recover for death of intestate caused by defect in a culvert in highway. Plea, the general issue. Trial by jury at the June Term, 1917, Caledonia County, *Fish*, J., presiding. Verdict for the plaintiff. The defendant excepted.

*Searles & Graves* for the defendant.

Approaches of a bridge are whatever is necessary to connect the bridge with the public roads or streets, either at the end thereof or to make such roads or streets conform to the grade of the bridge. *Tinkham* v. *Stockbridge*, 64 Vt. 480; *Chicago* v. *Pittsburgh, etc., R. R. Co.*, 247 Ill. 319; *City of Bloomington* v. *Illinois Cent. R. Co.*, 49 Ill. App. 129; *Daniels* v. *Town of Athens*, 55 Ga. 609; *Town of Ohio* v. *M. Ry. Co.*, 45 Ill. App. 572; Words and Phrases, Vol. 1, 466.

The weakness of the guard rails was not an insufficiency of the drain pipe. They were a part of the dirt highway on solid ground outside of, and distinct from, the drain pipe. *Castle* v. *Guilford,* 86 Vt. 540; *Fifield's Admx.* v. *Rochester,* 89 Vt. 329.

A culvert is an arched passage or drain for water beneath a road, canal or railroad. *Carroll County Commissioners* v. *Bailey,* 122 Ind. 46, 23 N. E. 672; *Herrick* v. *Holland,* 83 Vt. 502; *Gale* v. *Dover,* 68 N. H. 403, 44 Atl. 535; *Boyd* v. *Derry,* 68 N. H. 272, 38 Atl. 1005.

The plaintiff is precluded from a recovery, because his intestate, although approaching a curve in the road, did not have his automobile under perfect control, as required by the statute. He was guilty of contributory negligence, as a matter of law, *Rebillard* v. *Minn. St. P. & Ste. M. R. Co.,* 216 Fed. 503, 133 C. C. A. 9, L. R. A. 1915 B, 953; *Houston Belt & Terminal R. Co.* v. *Rucker,* (Tex. Civil App.), 167 S. W. 301; *Garrett* v. *Peoples R. Co.,* 6 Penn. (Del.) 29, 64 Atl. 254; *Wentworth* v. *Waterbury,* 90 Vt. 60.

*H. C. Shurtleff* and *Guy W. Hill* for the plaintiff.

STATEMENT BY WATSON, C. J.    This action is brought under the statute, in the name of the personal representative of Edmund C. Morse, deceased, for the benefit of his next of kin, for damages sustained through his death in an automobile accident when traveling upon a public highway in the town of St. Johnsbury, on the 22nd day of October, 1916.

At the close of the evidence the defendant moved for a directed verdict on grounds stated in its brief under four heads as follows:    (1) The place of the accident was not a culvert, within the meaning of the law; (2) negligence on the part of the town is not shown; (3) the decedent was guilty of contributory negligence; and (4) no recovery can be had, because notice of the accident was not given as required by statute. The motion was overruled, and exception saved.

The evidence introduced on the trial is stated below only so far as is necessary in disposing of the foregoing motion, outside of which no question is presented.

The evidence showed, or tended to show, stated in its most favorable light to the plaintiff, the following facts: At the time of the accident Morse (the decedent), accompanied by his

wife, and the Misses Alice F. Bancroft, Maud E. Wetherby, and Amelia D. Lee, was driving his automobile northerly over the public highway between St. Johnsbury Center and Lyndon, going north. This road is much traveled. The place of the accident is some five hundred feet north of the railroad crossing, known as the "Cobb Crossing." Along there for some distance the road was constructed by a sidehill cut most of the way, removing material from the upper or west side and placing it on the lower or east side to make the fill. The evidence as to the length of the fill varied, showing it to be from 79 feet to 200 feet long. The width of the traveled portion of the road over the fill varied from 13½ feet to 17 feet and 9 inches. At the culvert it was "a bad narrow place." Beneath the surface of the highway at a certain place in this fill is a culvert consisting of a tile drain, eight inches inside diameter, covered by the fill, and down four or five feet from the top of the edge of the road. The bank there is quite steep and near six feet high on the easterly side of the road. On that side the tiling seems to be protected only by earth. On the westerly side of the road there is a high ledge which goes up to the height of 25 to 30 feet, but it does not extend so far north as the culvert. Between the ledge and the culvert, and extending some farther north, the ground is higher than the road and slopes towards it. At the upper end of the culvert, rocks and stones are built up to the height of two or three feet around the tiling. The drain extends diagonally across the road, and on the culvert there is a curve in the road toward the east. The culvert runs through the fill, except at the upper side of the road, and consequently no part of the fill was necessary (in constructing the road) as an approach or as approaches to the culvert, and none of it was put in for such purpose. No stream of water runs through there regularly, but the culvert is necessary in the spring of the year, and in times of rain storms, to carry off surface water. The object of the fill was to improve the grade, not to fill up to the structure of the culvert so that travelers may the better pass over it. There was a fence on the bank of the fill, made of wooden posts about four or six inches in diameter, set in the ground, and boards an inch in thickness nailed thereto. Over the culvert and along southerly from it for some distance, the posts were rotten where they went into the ground, and the boards were old, weather beaten, and rotten; and along the same place and distance the fence was

down the bank about eighteen inches below the level of the road, and leaning more or less outward from the road. New filling had been put into the road, making it higher than the top of the ground where the fence posts were.

The accident occurred on Sunday evening about 6.30 o'clock. The night was very cloudy and quite dark. The decedent was seated on the left hand side of the front seat. His wife sat beside him. The young ladies mentioned sat on the rear seat. When at the Cobb Crossing they noticed the lights of two automobiles which were coming from the north on the other side of where the accident happened. They saw the two cars coming and spoke about them. The car ahead was being driven by one Dudley who was accompanied by his wife; the other car was occupied and being driven by one Shepard. On the trial of this case, Dudley testified that his car met and passed the decedent's car about thirty feet south of the culvert; that at that time both cars were running slowly because of the curve in the road; that the decedent's car, with its lights burning, "was coming along the road very slowly," and shortly after he passed it the car seemed to strike the fence and at the same time rolled sidewise over the embankment; that at the time the car went over it was running extremely slow or had practically stopped; that the fence offered no resistance to the car, it broke, and the part hit by the car simply fell over the bank; that he did not think it scraped the fence before it went over—went over about the time it struck the fence; that the lights from Shepard's car shone directly on decedent's car, and lighted up the road very clearly; that he did not notice the tiling (of the culvert) that night, but was there later and could pick out the place where the car landed at the bottom of the bank; that this was at about the same point as the mouth of the tile,—he found glass there evidently from the windshield of the car.

Morse and his wife were almost instantly killed, and Miss Wetherby was so injured that she was thereafter unable to remember very much about the accident.

Shepard, who was driving the second car seen coming from the north, testified to seeing the accident; that at the time it occurred he was a little north of the place where it occurred and going south, facing it; that he saw the decedent's car and Dudley's car meet, and that about the length of a car past their meeting the lights of the decedent's car began to tip and the

car went over; that he ran down to where the car was and did what he could in helping to lift the car and get the people out from under it; that he visited the scene of the accident the next afternoon, and then examined the fence, or rather noticed a new fence there; that where the car went over the bank the dirt seemed to be soft; that he should think the car went down six feet before it stopped, and should think the tile pipe was down four or five feet from the edge of the road; that the car went over "nearly directly on the curve." The witness was then asked "And that is where the culvert is that you have told us about?" Answering, he said, "Yes, I think the culvert is really to the north, just at the edge where the road straightens." He further testified that the decedent's car was going ahead very slowly when it tipped over; that the next afternoon when there, he "could see where the windshield was broken and where the rods stuck in the earth and the oil from the engine run out"; that this was just at the end of the drain pipe, just front of the end, and it was where the car stopped when it went over the bank; that the car went off sidewise. In re-cross-examination the witness said, "It appeared that, it seemed to tip nearly straight, bodily, as though it had given right out under the wheels and, facing the light, it looked as though it simply tipped over."

The witness testified to examining the tracks that afternoon. Thereon he said there was only about ten or twelve feet of track over the bank, which he considered was made by decedent's car; that as "it broke off it made a track of some ten or twelve feet, a little more than the length of the car"; that this track was nearly directly under the car, a little over the length of the car, not back ten or twelve feet. Defendant's attorney then asked the witness, "Then you really think don't you Mr. Shepard, that that just caved right off there with him sideways?" To which the witness answered, "Yes, sir." In answer to the question whether there was any evidence there in the tracks, of the car sliding sidewise or otherwise, he said it did not appear to him that it slid sidewise at all; that "it simply went down there and the turf cut off and it went off." The witness said he saw a track below post holes back 30 or 40 feet, but it was not a fresh track, and he was positive it was made at some other time—not made by the decedent's car; that he saw tracks back

not over five or six feet which could have been made by that car, just a mark as it went off the bank.

Miss Bancroft, a school teacher and one of the young ladies mentioned as riding in decedent's car, testified that she sat on the right hand side of the back seat, next to the fence. On being asked what she remembered about the accident, she stated that she remembered noticing, when at the Cobb Crossing, the lights coming down the hill on the other side of where the accident occurred, and spoke about them, but did not remember anything else until they crashed over onto the fence and went down the bank, tipped onto the fence; that she remembered hearing the crash then. She further testified that the car was going very slowly; that her head was resting on the back of the car; that she does not remember that she felt any severe jolting before the car tipped and went over; that she did not hear the car scraping the fence before the car tipped over, and did not know they were near a bank or anything—did not hear any cracking of boards or anything of the kind.

Miss Lee, another of the young ladies riding on the back seat, testified that the car was going very slowly; and tipped over sideways; that the whole side of the car seemed to settle at once, and the car within a second more turned over.

William Ahern, a man forty years old, who had always lived in the house on that road immediately north of the place of the accident, and owned the field adjoining the highway on the east of that place, testified to helping lift up the car so to get the people out from under it after it went down the bank, and that he knew where the tile pipe was on the lower side of the road. He was then asked to tell where the car was that night with reference to this tile pipe, and answered that he should judge that the car was partly or a little more than half way north of the tile pipe, tipped over. This witness gave further evidence tending to show that the car passed over the tile pipe in going down the bank. In cross-examination he said the car finally landed in front of the opening of the tile pipe—tipped over there. He further testified that there had always been a little culvert there, and that the tile pipe had been in about fifteen years; that the fence at the culvert was made of inch boards, and must have been there about the same number of years.

Jack Adams, who was at the place of accident about 7 o'clock that night, testified that he looked the fence over and

noticed it was old, one or two of the posts being rotted away where they went into the ground, and the boards old and rotten; that the post holes were on a slant down some 18 inches from the roadway, and the road was narrow at that place; that he saw a wheel track along the edge of the bank inside of where the post holes were; that the wheel rut went past three or four post holes before the car went over the bank; that he followed the track back, but not as far as the point of the ledge; that the track was out of the beaten track of the road, but not out of the road; that the distance between the extreme right-hand edge of the traveled track and the edge of the slope was probably a foot and a half, and the fence was below the edge of the slope about the same distance; that he examined the old fence, two or three lengths of which were down; that back southerly of the lengths that went down, he looked pretty closely to see whether there were indications of the fence having been scraped by the automobile, but found no such indications; that there came a time when the car was gradually leaving the road, and proceeding in this way (it looked to the witness as though) the right-hand wheel passed against two or three posts just before it tipped over; but there was no evidence seen by the witness indicating that the car hit the fence before it tipped over.

E. H. Meacham was at the place of the accident between 8.30 and 9.00, the next morning. Testifying concerning the tracks supposed to have been made by the decedent's car, he said he thought when the decedent came on top of the knoll at the point of the ledge, he turned a little and ran pretty nearly straight until he got to the culvert or pretty near the culvert, and went off "all at once"; that he did not think the decedent "run more than the bigness of the car off from the road after it began to break." The witness further testified that he examined the fence, but did not see any fresh marks on it southerly any distance from where the car went down; that he saw track was some out of traveled portion of highway, but not as far as the fence; that somewhere between fifty and seventy feet after left traveled portion of road, presume was out of main track three feet; that the margin where the right wheel ran was some of the way dirt and some of the way grass; did not cut in much of any, only just so could track it. Began to cut in when got almost to culvert.

Scott S. McDowell testified to being at the place in question the same evening and shortly after the accident occurred, and to looking over the fence with a flashlight. He stated that back about three lengths from the tile the fence was level with the road, but going along within a length and a half of the tile it was hung out on the edge of the bank; that he examined the fence south of where the car broke it down, and found one post gone, and the boards where the car went over were all decayed; that he examined the fence along back of where the car went down to see whether there were marks on it, and found the length before getting to the tile pipe slightly grazed, which was all the mark there was up till the fence gave way; that there was a very little grass between the fence and the traveled portion of the road as one went onto the culvert, and it was on a slant by the culvert; that back from the culvert the grass was about level with the road, at the culvert it sloped down a foot and a half along a length of the fence, and possibly a little more. This witness also testified concerning automobile tracks seen by him as follows: That they had gradually gone out of the road along the bank for (should say) two lengths and a half of fence, being as straight as a man could run; that they came along "close to the edge of the bank, and the bank simply caved away and let the car directly over, turned bottom side up."

WATSON, C. J. The defendant contends that the culvert in question had no approaches, within the meaning of the law, and consequently the plaintiff must show that the defect which caused the death of the decedent was in the drain pipe itself and not in any part of the dirt highway which extends over it; that, unless the defect was in the pipe itself, it was not an insufficiency of the culvert which caused the accident. But in this contention the defendant fails to recognize the possibility of liability upon the evidence because of an insufficiency of the culvert for want of a railing or guard suitable to the place and conditions. If the cause of the accident was such insufficiency, without any negligence on the part of the decedent contributing thereto, the defendant is liable. *Castle* v. *Guilford*, 86 Vt. 540, 86 Atl. 804; *Wentworth* v. *Waterbury*, 90 Vt. 60, 96 Atl. 334.

The evidence particularly shown or referred to in the above statement, was such as to entitle the plaintiff to go to the jury on the question as to whether the decedent's car did not go over

the bank directly above and over the culvert. If the affirmative of this was established as a fact, then the questions raised concerning the approaches to the culvert became immaterial, and the defendant's liability depended upon whether it be shown that the culvert was insufficient for lack of a railing or guard suitable to the place and conditions. On this question the evidence was not all one way, but much of it tended to show such insufficiency, and it was a question for the jury.

The evidence to which reference is made in the preceding paragraph, considered in the light most favorable to the plaintiff, as it must be on questions raised by the motion for a verdict, tended to show, also, that the decedent was in the exercise of the requisite degree of care at the time of the accident, with reference to the place, manner, and speed of driving his car, thus making it a question for the jury to determine.

It is said in particular under this head, however, that the decedent had no right to drive his car (a) because of the condition of his eyes, and (b) because of the condition of the brakes to his car. The only evidence to which our attention is called touching the condition of his eyes is that of a witness who testified that the decedent, in a conversation with her some three or four weeks before the accident, said: "When I meet a car the reflection is so strong on the windshield that it reflects on my glasses, and it bothers me to see the road." And further said he did not know but he would have to stop driving nights, or something to that effect. The declaration quoted contains all there is of force as evidence concerning the condition of decedent's eyes, and the same might truthfully be said by any one wearing glasses when driving an automobile. Yet glasses are so commonly worn by persons engaged in such work as to give the declaration shown, standing alone as evidence on this question, and viewed in its most favorable light for the plaintiff, too slight force to warrant a court in ruling, as matter of law, as here requested. Besides, there was no evidence tending to show that at the time of the accident the decedent's vision was affected in the way mentioned in his previous declaration to the witness.

Concerning the condition of the brakes, the only evidence in the case bearing thereon and noticed in defendant's brief, is the testimony of one Goss, who had charge of the repair shop connected with a garage at St. Johnsbury. He took the decedent's car from the place of the accident to the garage men-

tioned the day after it went over the bank, and repaired it. · He testified that he found the brakes loose and he adjusted them, took them up; that they were loose from the natural wear, but nothing serious was the matter with them, and they could be used by allowing for the wear. Yet it could not be said, as a matter of law, that such defective condition of the brakes constituted any part of the cause of the accident; for, as already seen, according to the testimony of several witnesses, the car, at the time of the accident, was running very slowly, and one witness, who saw the car before and at the time it went over the bank, said it "was either running extremely slow or practically at a standstill." This evidence, if believed, shows that the brakes were working well enough so that the decedent had full control of his car all the time until it tipped over the bank, after which the brakes could not have been effective, even though in good working condition.

What we have said in the last paragraph is equally conclusive against the defendant's contentions that a verdict should have been ordered because the decedent was guilty of contributory negligence, in that he violated the statute (P. S. 4094, amended by No. 147, Acts of 1912), in not providing his car with an adequate brake; and that a recovery is precluded by the fact that, though approaching a curve, he did not have his car under perfect control, as required by P. S. 4094 as amended by No. 141, Acts of 1910. Let it suffice that, in view of the evidence, neither question could be ruled as a matter of law.

The fourth ground of the motion, namely, that notice of the accident was not given as required by law, is pressed upon the change in the wording of the statute from what it was when the case of *Eames* v. *Brattleboro*, 54 Vt. 471, was decided. Then the statute read: "That nothing in this section shall be construed to apply to any case where the person injured shall in consequence thereof be bereft of his or her reason." Acts 1874, No. 51. In the revision of 1894 (V. S. 3493), the statute, by change of wording, was made to read as it now does: "but the provisions in relation to notice shall not apply to a person who in consequence thereof is bereft of reason." It is argued that by this change persons financially injured through the death of their next of kin must give notice the same as they would be required to give if they were themselves physically injured. The absurdity of such a construction is manifest from its logical

result; if a person injured is, in consequence thereof, bereft of his reason, and the injuries result in his death twenty-one days after the occurrence of such injury, no action can be had or maintained, under the statute, for the benefit of the next of kin, because notice was not given within twenty days of the time of the injury, during all which time the injured person was yet alive. An absurd purpose is not to be attributed to the lawmakers, and a construction leading to an absurd consequence must always be avoided. *In re Howard's Estate,* 80 Vt. 489, 68 Atl. 513; *Morse v. Tracy,* 91 Vt. 476, 100 Atl. 923. Moreover, it is not clear that any change in the law was intended; and the rule is, that changes in a revision of statutes will not be regarded as altering the law when it is well settled by plain language in the statute or by judicial construction, unless it is clear that such was the intention. *Clark* v. *Powell,* 62 Vt. 442, 20 Atl. 597; *Stearns* v. *Graham,* 83 Vt. 111, 74 Atl. 486.

This in effect disposes of all the substantial grounds argued why a verdict should have been ordered, and the motion was properly overruled.

*Judgment affirmed.*

TAYLOR, J. (dissenting). I am unable to agree that there is any evidence fairly tending to show actionable negligence. It must be conceded that there was evidence tending to show that the railing as such was defective; that the car went over the bank at a point directly over the culvert, treating the tile drain through the fill as such; and that a suitable guard rail at that point would have averted the accident. Still an important part of the case to establish liability is lacking. In no view of the evidence was the railing a part of the culvert or in any sense appurtenant thereto. All agree that the fill was not an approach to the culvert, so our cases holding towns liable for insufficient guarding of approaches are not in point. As I view it, the evidence tended to show no more than that the fill created such a situation that the statute (G. L. 4534) required the defendant to erect and maintain a suitable railing. But towns are not liable in damages for negligence in this regard. *Moody* v. *Town of Bristol,* 71 Vt. 473, 45 Atl. 1038. It is only for insufficiency or want of repair of a bridge or culvert that the statute gives a right of recovery. G. L. 4615. That a culvert may be insufficient, in contemplation of the statute, for lack of a railing

or guard suitable to the place and conditions is not questioned, and I can readily agree with the majority that the defendant's liability depends upon whether it be shown that the culvert in question was insufficient in this regard; but I cannot agree that the evidence has any such tendency. I conceive the law to be that, to establish liability, there must be some evidence fairly tending to show that the railing was required to make the *culvert* safe for travelers. I find no evidence connecting the culvert with the accident. The condition of the roadbed was in no way affected by the presence of the tile through the fill. The accident would have happened in the same manner and for the same reasons if the culvert had not been there, or being there, if it had extended to a point outside the limits of the highway. In short, the presence of the culvert is in no way connected with the happening of the accident, and the railing is not shown to have been required because of the culvert, but for a wholly independent reason, as to which there is no liability. I am forced to the conclusion that the defendant's motion for a directed verdict should have been sustained.

POWERS, J., concurs in the dissent.