ZENO'S BAKERY, INC. v. STATE

February Term, 1933.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed May 2, 1933.

*Lawrence C. Jones,* Attorney General, for the State.

*Herbert G. Barber* and *Ernest E. Moore* for the plaintiff.

THOMPSON, J. This is an action brought under the provisions of section 5 of No. 61, Acts of 1931, to recover for damage to plaintiff's truck caused by the alleged insufficiency and want of repair of a culvert on the highway from Bellows Falls to Chester. This highway was taken over by the State, pursuant to the provisions of such act, on April 13, 1931. By the provisions of section 5, the State is made liable for injuries sustained upon a highway taken over by it to the same extent that a town is liable under the provisions of G. L. 4615, 4617, and 4618. There was a trial by jury and a verdict and judgment for the plaintiff.

The culvert is a stone box with the walls laid dry. It is covered with flagstones except at each end where there is a cement slab. There was a head wall at each end attached to the cement slab. The opening through the culvert is four feet, three inches wide, five feet, six inches in height at its westerly end, and six feet at its easterly end. The brook that passes through it flows from the west towards the east. At the time of the washout, hereinafter mentioned, the width of the highway, including its shoulders, over the culvert was about twenty-one feet, nineteen feet of which was covered with tarvia. The surface of the road over the westerly end of the culvert was about eleven feet above the bed of the stream and over its easterly end about twelve feet, six inches. The highway over

the culvert and for about ninety feet southerly of it was nearly level; then it began to rise at a 6 per cent. grade. The highway northerly of the culvert is on a rising grade.

The highway over the culvert, and on both sides of it for a considerable distance, had been raised from time to time by a fill composed of gravel, stone, loam, and some sand. The surface of the fill was four or five feet above the top of the culvert. On the westerly side of the fill, both north and south of the culvert, and extending some distance from it, there was riprap of an irregular height that operated, in part, as a retaining wall.

The stream that passes through the culvert has a watershed of about fifteen hundred acres westerly of the highway, from which there is a quick run-off. For about eight hundred feet westerly of the culvert the land is rather flat. Above that the stream flows in a narrow, rocky channel through a deep, heavily wooded gorge. The location of the intake of the culvert to the channel of the stream is such that in any period of high water when the stream rises above the channel that it runs in at low or normal water, the trend and velocity of the stream is such that it strikes the bank of the fill northerly of the culvert, then turns and flows southerly past the culvert against the bank of the fill southerly thereof, where it is deflected so that it flows westerly to some extent before it enters the culvert. This tends to produce eddies so that drift wood and débris collected by the stream do not readily pass into the culvert, but are thrown around and across its intake with a tendency to obstruct it.

There was a heavy rain in Rockingham in the general locality of the culvert in the night of July 9, 1931, that lasted until sometime in the early hours of July 10. The stream was raised to flood magnitude and the intake of the culvert was choked by material carried down by it so that only a small quantity of water passed through the culvert. The water set back from the culvert, formed a large pond, and rose nearly to the surface of the highway. By reason thereof, between twelve o'clock, midnight, and one o'clock, A.M., July 10, the traveled portion of the highway directly over the culvert and southerly of it was washed out for a distance of from twenty-five to forty-five feet, and to a depth of from about five feet at the north end of the washout to about twelve feet at its south end. The culvert was not damaged except that the westerly head wall was broken off.

At about one o'clock, A.M., July 10, the plaintiff's truck went into the washout at its south end, and was so badly damaged that it was practically worthless.

The defendant moved for a directed verdict at the close of the evidence. The motion was overruled, and it excepted.

The first six grounds of the motion are so related to the principal questions raised by the defendant that we consider them together. Their substance is that the plaintiff has not shown any shortage of legal duty on the part of the defendant; that there is no evidence that the culvert was insufficient and out of repair; that the damage suffered by the plaintiff was primarily due directly and exclusively to natural causes without human intervention, which could not have been prevented by any amount of foresight, pains, and care reasonably to be expected, and the resulting damage was an act of God.

The substance of the allegations in plaintiff's complaint is that the culvert was not of sufficient size to properly receive and discharge the waters of the brook; that it was constructed of stones loosely placed so that the water could and did work around and through the fill, "or approaches"; that "the approaches" of the culvert were made of sand, dirt, and gravel which were not of sufficient strength and texture to prevent washing away; that the culvert and "approaches thereto" were so constructed that the water was compelled to enter the culvert at a sharp angle, which impeded and retarded the flow of water, débris, and flood wood through it; that the culvert was not clear of débris and flood wood and it thereby became clogged and prevented the waters of the brook from passing through it; that by reason thereof the waters of the brook set back and formed a pond that rose to such a height that it caused the waters thereof to overflow the culvert and "approaches thereto," and to wash out the highway, as hereinbefore stated.

The defendant contends that no part of the highway southerly of the culvert was an "approach" to it within the meaning of the statute as construed by this Court, but was the highway itself; and therefore it is not liable in this action.

It appears from the uncontradicted evidence that the culvert was constructed forty years ago; that the fill over, and on each side of, it has not been replaced during that time, but it has been raised; and that the location of the highway has not been changed during that time.

Prior to 1880, towns were liable for damages that arose from the insufficiency or want of repair of their highways. By No. 13, Acts of 1882, now G. L. 4615, their liability is restricted to damages that arise from the insufficiency and want of repair of bridges and culverts which towns are liable to keep in repair.

The provisions of the Act of 1882 were construed in *Ford* v. *Braintree,* 64 Vt. 144, 24 Atl. 633, 634. The plaintiff's evidence in that case tended to show that he was injured at a point in the highway five rods distant from the culvert in question; that the culvert was insufficient in not being large enough to carry off the water collected in the ditch, and that in consequence the water set back and its action made the hole in the road which was the immediate cause of the accident. This Court, when holding that the defendant was not liable, said:

> "If the defendant town is liable for damages caused by this defect in its highway, it would have been liable had the defect been one hundred rods, or at any other distance, from the culvert, provided it could have been shown that the insufficiency or want of repair of the culvert was the primary. though remote cause of it. Many defects in highways might be traced to the insufficiency or want of repair of culverts and sluices as indirect causes. It might often be said that, if there had been a larger culvert at a certain point, or the existing one had been kept unobstructed, the road at another point would not have been gullied and out of repair. But, obviously, it was not the intention of the Legislature to allow persons injured to recover damages for injuries sustained by reason of such defects. * * * * To come within the act the accident must occur, and the injury be sustained, while the traveler is passing over the bridge, culvert, or sluice, or that portion of the road which constitutes the approaches to it, so that the insufficiency and want of repair of the structure itself, or of its approaches, is the direct cause of the injuries sustained."

To the same effect are *Widham* v. *Brattleboro,* 105 Vt. 210, 166 Atl. 22, and *Mobus* v. *Waitsfield,* 75 Vt. 122, 125, 53 Atl. 775.

 The culvert in question ran through the fill of the highway. There is no evidence that any part of the fill that was washed out was necessary as an approach to it, or that it was put in for such purpose. It fairly appears from the evidence that the object of the fill was to improve the grade of the highway, and not to fill up to the structure of the culvert so that travelers might the better pass over it. *Bigelow, Admr.* v. *Town of St. Johnsbury,* 92 Vt. 423, 426, 434, 105 Atl. 34. Even if it can be said that the culvert was insufficient, as alleged by the plaintiff, and that such insufficiency was the primary cause of the accident, the plaintiff cannot maintain this action, because he failed to prove that the point in the highway where the accident happened was an approach to the culvert. A verdict should have been directed on the ground that the plaintiff failed to show any shortage of legal duty on the part of the defendant.

Another ground of the motion that we consider is that the plaintiff's damage was caused by an act of God. We assume, for the purposes of this question, that there was evidence on which the jury could have found that the place where the truck went into the washout was an approach to the culvert.

 In order to be a defense to the action, as an act of God, the damage suffered by the plaintiff must have been proximately due, directly and exclusively, to natural causes without human intervention, which could not have been prevented by any amount of foresight, pains, and care, reasonably to be expected. If the damage sustained by the plaintiff was not due directly and exclusively to such natural causes, in other words, if the negligence of the defendant, as an active and cooperative cause, mingled with the operation of the natural causes, the injury was not, in a legal sense, the act of God. So if the injury the heavy rain occasioned might have been avoided or prevented by human prudence, foresight, pains, and care reasonably to be expected from the defendant, but not exercised by it, the defendant is liable. *Eagan* v. *Central Vermont Ry. Co.,* 81 Vt. 141, 69 Atl. 732, 16 L. R. A. (N. S.) 928, 130 A. S. R. 1031; *Porter Screen Mfg. Co.* v. *Central Vermont Ry. Co.,* 92 Vt. 1, 11, 102 Atl. 44; *Bennington* v. *Fillmore & Slade,* 98 Vt. 405, 421, 130 Atl. 137.

The plaintiff contends that the damage suffered by it was not due directly and exclusively to natural causes without

human intervention, but that certain negligent acts of the defendant, which might have been prevented by the foresight and care reasonably to be expected from it, cooperated, as an active cause, in producing the injury. The particular acts of negligence relied upon by the plaintiff are that the culvert was too small to take care of the run-off from the watershed of the brook; that the fill of the highway at the culvert was made of sand, dirt, and gravel, and it was not of sufficient strength and texture to prevent washing away; that it was improper engineering and improper construction to have the water of the brook enter the culvert at an angle; that good engineering and modern standards of construction required that there should have been a retaining wall, as high as the roof of the culvert, extending upstream from the culvert so that the channel of the stream as it entered the culvert would have been straight with the barrel of the culvert; that the defendant permitted flood wood and débris to accumulate in the culvert and along the stream above it.

As to the last specified act of negligence, there is no evidence that there was any flood wood or débris in the culvert or in the brook or on its banks within the limits of the highway when it began to rain in the night of June 9. The undisputed evidence is that there was no flood wood or débris in the culvert or in the brook or on its banks for fifty feet above the culvert on June 26, 1931, when the culvert was inspected by Mr. Lawrence, the district highway commissioner of that district. It will be presumed, in the absence of evidence to the contrary, that such condition continued up to the time of the storm. We do not know of any statute or rule of law that imposed a legal duty upon the defendant to remove drift wood and débris from a stream beyond the limits of the highway.

It is not disputed by the defendant that if there had been a retaining wall extending up stream, as prescribed by the civil engineers who testified for the plaintiff, it would have lessened the danger of the culvert being choked by drift wood and débris at times of high water; and it would have been good engineering and modern construction. But the fact that the culvert was not so constructed does not necessarily imply that it was insufficient within the meaning of the statute. These same engineers testified that if the intake of the culvert was choked

by a stump too large to pass through it, the presence of a retaining wall would not have prevented the damage.

■ Under the statute it was the duty of the defendant, in view of the amount and kind of travel that passed over it, to keep the culvert in a reasonably safe condition with reference to such accidents as might be expected to happen thereon. This duty, as affecting the defendant's liability to pay damages occasioned by defects in the culvert, is not measured by the exercise of ordinary care and diligence on its part in respect of keeping it in repair, nor, on the other hand, is it liable as an insurer for damages resulting by reason of the insufficiency and want of repair of the culvert. The statute imposed the duty of keeping the culvert in good and sufficient repair. If the defendant is chargeable with any fault in respect of this duty, liability attaches. *Kelsey* v. *Glover,* 15 Vt. 708; *Prindle* v. *Fletcher,* 39 Vt. 255; *Graves* v. *Waitsfield,* 81 Vt. 84, 89, 69 Atl. 137.

■ The general rule is that if a culvert is constructed so that it does not obstruct the normal flow of the stream and the ordinary high water through it, no liability attaches for damages caused by unforeseen and extraordinary freshets. *Eagan* v. *Central Vermont Ry. Co., supra; Bennington* v. *Fillmore & Slade, supra; Pittsburgh, etc., Ry. Co.* v. *Gilleland,* 56 Pa. 445, 94 A. D. 98; *Diamond Match Co.* v. *New Haven,* 55 Conn. 510, 13 Atl. 409, 3 A. S. R. 70; *Inhabitants of Palmyra* v. *Waverly Woolen Mills,* 99 Me. 134, 58 Atl. 674; *Sprague* v. *Worcester,* 13 Gray (Mass.) 193.

In *Pittsburgh, etc., Ry. Co.* v. *Gilleland, supra,* the rule, which is quoted with approval in the *Eagan* Case, is stated as follows:

> "The stream, though small, must find vent, or overflow the adjacent land and undermine the railroad. Its size, the character of its channel, and the declivity of the circumjacent territory which forms the water-shed, indicated the probable quantity of water to be passed through. Proper engineering skill should observe these circumstances, and supply the means of avoiding the injury which would result from locking up the natural flow, or obstructing its passage so as to cause a reflux in times of ordinary high water. Beyond this, prudent

> circumspection cannot be expected to look, and there is therefore no liability for extraordinary floods, those unexpected visitations, whose comings are not foreshadowed by the usual course of nature, and must be laid to the account of Providence, whose dealings, though they may afflict, wrong no one.''

■ There is no evidence that the culvert is not sufficient to pass the stream at its normal flow and at ordinary high water. It appears from the uncontradicted evidence that since the culvert was constructed forty years ago, it has been sufficient, with one exception, to pass the normal flow of the stream and all high water, including that of the flood of 1927. The exception is that several years ago a portion of the westerly bank of the fill northerly of the culvert was washed out to a point a little into the middle of the traveled part of the highway. It does not appear what caused that washout.

■ ■ There is some controversy between the parties as to what choked the intake of the culvert and caused the waters of the stream to set back. The plaintiff says that its ''evidence (which governs here) tended to show that the culvert was plugged by rails, post, and débris that the State should have provided against.'' It does not refer us to any evidence or any principles of law that support its contention that it was the legal duty of the defendant to provide against such rails, posts, and débris. It says further: ''The entire testimony of Helyar and Hollendér (its civil engineers) especially are replete with evidence tending to show actionable negligence. It is impractical to refer to it all. The transcript is made controlling.'' Their testimony covers forty-four pages of the transcript. This is not proper briefing as it is not in compliance with the requirements of Supreme Court rule 8. Questions so briefed need not be considered; and we do not consider them. *Town of Brattleboro* v. *Carpenter,* 104 Vt. 158, 158 Atl. 73; *West Rutland Trust Company* v. *Houston,* 104 Vt. 204, 158 Atl. 69; *Foss* v. *Sherwood,* 104 Vt. 141, 157 Atl. 834; *In re Everett's Will,* 105 Vt. 291, 166 Atl. 827.

It appears from the uncontradicted evidence that two large hemlock logs lodged in or across the intake of the culvert, and that a large hemlock stump with roots six or seven feet across

was wedged tightly in the culvert above the logs. The stump and its roots were too large to pass through the culvert. The defendant claimed that the stump was the principal object that choked the culvert. The plaintiff says that the evidence that a stump "plugged" the culvert is flatly denied by its witnesses, Zeno, Lewis, Porter, and Patterson. There is no such denial. All that these witnesses testified about the stump was that they did not see it.

However, it is immaterial as to just what objects choked the intake of the culvert. Everything that was washed down by the stream helped to do it. All of the evidence to which we have been referred, and much more, has been carefully examined, and we are satisfied that no breach of legal duty on the part of the defendant in the construction and maintenance of the culvert has been shown.

That the storm was extraordinary and of unusual violence is best shown by the damage it did. It was local in that it extended over a limited area in the town of Rockingham, but in that area a total of about six miles and a half of different highways was washed out to a depth of from eighteen inches to twelve feet, and for distances varying from a few feet to a quarter of a mile. In one highway three hundred feet were washed out, "so that you would never know that there was any road there at all." Ten bridges and culverts were damaged. One bridge "was carried away entirely, abutments and all." The other bridges and culverts "were put out of commission either by loss of wings and one abutment or the washing out of the approaches." Above the culvert in question not only were the two large hemlock logs and the hemlock stump carried down the stream, but, also, alders growing along the stream were uprooted and carried down. The water that was set back above the culvert formed a pond with an area of an acre or an acre and a half, and its greatest depth at the culvert before the highway was washed out was about ten feet.

The case comes clearly within the doctrine of *Eagan* v. *Central Vermont Ry. Co., supra;* that the sole proximate cause of the damage suffered by the plaintiff was an act of God for which the defendant is not responsible.

A verdict should have been directed for the defendant on that ground. Our determination of the two questions considered

is such that it is not necessary to consider other questions that were raised.

*Judgment reversed, and judgment for the defendant to recover its costs.*