HOWARD C. WAGNER, ADMR. *v.* VILLAGE OF WATERBURY.

January Term, 1938.

Present: POWERS, C. J., SLACK, MOULTON, SHERBURNE and BUTTLES, JJ.

Opinion filed February 1, 1938.

*Fred E. Gleason* for the defendant.

*Wilson, Carver, Davis & Keyser* for the plaintiff.

BUTTLES, J. The plaintiff as administrator of the estate of his deceased son brings suit in tort under the statute against the

defendant village for alleged wrongful neglect or default caus-
ing the death of plaintiff's intestate. It is alleged that defend-
ant was engaged in the private business of furnishing water to
the inhabitants of the village under contracts for payment of
certain fixed rates to the village for the use of such water, that
it permitted a certain water pipe under Stowe Street in the
village to become out of repair and to leak, as a result of which
water penetrated to the surface of the street, ran out upon the
cement pavement and froze making the same very slippery.

On November 25, 1935, shortly before noon, the plaintiff's
intestate—a boy about six and one-half years old—was killed
while crossing Stowe Street on his way home from school by
being struck by the automobile of one Haggett when it skidded
upon ice, caused and allowed to remain on the street, it is alleged,
by reason of the negligence of the defendant village. The case
comes here on defendant's exceptions from county court where
verdict and judgment were rendered for the plaintiff.

Defendant relies upon various exceptions taken to the over-
ruling of its motion for a directed verdict made at the conclusion
of the plaintiff's case and renewed at the conclusion of all the
evidence and it briefs these exceptions under three general heads
as follows:

> A. Regardless of an intervening cause, plaintiff
> failed as matter of law, to show that any negligence
> of defendant was a proximate cause of decedent's
> death;
> B. Defendant submits that as a matter of law,
> the actions and conduct of Haggett constituted an
> efficient intervening cause, standing between de-
> fendant's neglect, if any, and the injury; and thus
> the claimed neglect of the defendant was rendered
> and became the remote rather than the proximate
> cause of the injury, and
> C. The plaintiff has failed to show that defend-
> ant was guilty of any negligence that contributed
> in any way to the accident.

It is obvious that A and C cover somewhat the same ground.
█ In order to establish negligence on the part of the de-
fendant it was imperative to show that there was ice upon which

Haggett's car skidded at or before the time when the Wagner boy was hit.

There was a 9 per cent grade in the street down which Haggett was driving his 1930 Ford pick-up truck at a speed which he estimates at twenty to twenty-five miles per hour. An eye witness fixes the speed at thirty to thirty-five miles per hour. The evidence taken in the light most favorable to the plaintiff indicates that Haggett saw three small children about to cross the street from his right to his left. He set his brake at a point about sixty-one feet from the spot where the Wagner boy was hit, at the same time pulling his car to the left with the intention of going between the two children who had then gotten nearly across the concrete surface of the road, and the Wagner boy who was nearly in the middle of the road. A skid mark on the surface of the concrete indicated that he continued this course to the left for fifty feet and until the skid mark reached a point nine-tenths feet from the left edge of the concrete. Fearing that he would strike the first two children if he continued in that course he tried to turn his car far enough to the right to avoid them. He testified: "I put on my brakes and the wheels skidded, the marks showed on the cement, one wheel I believe, and I can't remember whether the other did at all, and I skidded down onto the ice, and when I struck the ice the car shot like that and I thought I would take the ditch, but I couldn't because the other two kids were there and I switched around and turned over there on the ice." In cross-examination he was asked: "How long was it after your car struck the little boy before your car tipped over?" A. "Quick as that" (snapping his fingers). And again: "It struck the child when it bore to the right."

Arthur Cross, who saw the accident from farther down the hill thus describes it: "Well Mr. Haggett's truck went over on the left and then swung back after he had hit the boy and tipped over on its left side on the ice." And in cross-examination: Q. "Before it struck the boy it got back over onto its right side again, did it not?" A. "Yes and tipped over." * * * Q. "Now tell the jury whether the car struck the boy before it started to the right or after." A. "Well that is hard to tell. He was coming down through there and trying to—one side of the road to the other—trying to dodge the boy, and he was on the right and on the left, it is kind of hard to tell." He also testified that

in his opinion the boy got no farther across than the middle of the road.

Tests made during the afternoon of the day of the accident by motor vehicle inspectors indicated that the brakes of the Haggett truck were so ineffective that when fully applied only the left rear wheel was checked at all and that wheel was not fully checked, that is, the brake did not cause it to slide continuously. The inspectors testified that they found a skid mark extending at an angle to the right for thirty-two feet from about the point where the fifty-foot course ended which was not as clear or pronounced as the fifty-foot mark. The line indicating this skid mark on deft's ex. A as drawn by Inspector Cleveland is quite irregular. Chief of Police Griffith, who worked with the inspectors during a part or all of the time that observations and tests were made, testified that he could find no track from the end of the fifty-foot course over towards the place where the car tipped over although he looked for such mark, which suggests that the thirty-two-foot mark must have been quite indistinct.

Inspector Marsh testified that the thirty-two-foot mark ended at the place where, he was told, the rear end of the truck had lain, tipped over, facing up the hill at an angle, with the front end of the car in the gutter. So that it would seem that at some time while the rear wheel was making that thirty-two-foot mark the front end had swung around to the right in an arc of about ninety degrees.

The evidence tends to show that the boy was struck by the right front wheel of the Haggett car. Computation of the distance from the rear left to the right front wheel indicates that that distance is exceeded by less than three feet by the distance indicated on the engineer's plan (plff's ex. 3) from the southerly end of the fifty-foot mark to the place where the boy was standing when struck. It would seem to follow that when the car was deflected to the right the front end started to come about on the left rear wheel as a pivot or a partial pivot until it struck the boy in advancing no more than three feet, and that thereafter the car continued to turn until it had described at least a right angle to its former direction, and that it then tipped over. All this, of course, at the apparent speed of the car, would occur almost instantaneously. An inspection of plain-

tiff's ex. 7 indicates that if the children are correctly placed—the boy with the white shirt in the position of the Wagner boy, six inches to the right of the center of the road and the boy with the cap in the position of the children who had crossed, there was ample room for Haggett to drive between them under normal conditions. There was some evidence that the Wagner boy was more than six inches from the middle of the road. If so, there would of course be so much more room for Haggett to drive through.

Does the evidence warrant a finding that there was ice in the highway upon which the car could have swerved before striking the boy? The skid mark itself indicates that the left wheel did not come upon ice, at least not before it reached the end of the fifty-foot course, and Haggett finally admits as much, although his testimony is to the effect that coming upon ice caused the car to "shoot," strike the boy and turn over. It is undisputed that water was coming out of one or two holes near the middle of a transverse expansion joint some thirty feet above where the boy was struck. Plff's ex. 2 indicates—confirmed by the testimony of several witnesses—that at the time the picture was taken water was running in both directions from the place where it seeped out and apparently reaching both edges of the road. There was also water escaping from between cobblestones in the gutter and apertures in the sidewalk on the westerly side of the road. There was ice in this gutter extending down the hill for a considerable distance and some ice upon the concrete pavement. To be sure a considerable number of witnesses testified that this ice extended up no farther than the middle of the road and that there was no ice on the easterly side, but some of these witnesses did not make observations until some time after the accident—in the case of the two automobile inspectors at least an hour and a half had elapsed. In the meantime it is admitted that it was thawing and the sun was shining brightly. Haggett testified that there was some ice on the extreme left of the road below the joint going down—"that it extended down about center way of the block—that it was about as big as a bushel basket or more—that it spilled out and came around back down into the gutter—spread out."

The plaintiff testified that when he returned from the hospital about 4 p.m. he picked up his little boy's glove from about

the center of the left-hand block of cement going down—at a point below Mr. Ryder's driveway—and that "there was something that had washed down where the glove lay, no solid ice, just a light flaky film as it thawed out on the cement," and that "from there up to where the water came out it was practically the same thing, no solid ice of any kind there, but plenty of water and slippery going, that is what it was." He also testified that when he came down soon after the accident but didn't stop because he was told that the boy had been taken to the doctor's office, there was ice in the center of the road.

We think the question whether there was ice in the road upon which the car skidded before hitting the boy was for the jury and that it cannot be said that the evidence was so clear and convincing that reasonable minds could not differ as to the answer to that question.

The undisputed evidence indicates that the water exuding from the concrete pavement above the place of the accident came from a leak in the defendant's six-inch water pipe under the surface of the road. When this was repaired on the day following the accident the water stopped running. Plaintiff's evidence tends to show that passers-by had seen this water on the road and more or less ice, depending on the temperature, about every day for more than a week. This is not questioned by the defendant except by evidence tending to show that there was a hard snowstorm eight days prior to the accident, which might account for water and ice on the highway for two or three days thereafter. It is undisputed that one member of the board of commissioners having general charge of the water department of the village government lived on North Street and passed the scene of the accident several times daily on his way to and from his place of business. Whether the village had notice of the existing condition through the knowledge that this responsible representative acquired or should have acquired was clearly for determination by the jury.

"It is well established with us that on the question of what is negligence, it is material to consider the consequences that a prudent man might reasonably have anticipated." *Woodcock's Admr.* v. *Hallock,* 98 Vt. 284, 290, 127 Atl. 380, 382; *Bennett* v. *Robertson,* 107 Vt. 202, 214, 177 Atl. 625, 628, 98 A. L. R. 152. We think that here it might well be found that

the consequences of the failure of the village in the matter complained of were exactly such as a prudent man might reasonably have anticipated, since the village may be presumed to know the dangers that might result to traffic on that street from the condition that existed there. It is also charged with knowledge that the sidewalk going up the westerly side of Stowe Street ended near this place; that there was a school farther down the same street, and that small children were passing and might be crossing the street here several times daily.

Defendant contends that ice upon the highway, if there was any, constituted merely a condition, that the sole proximate cause of the accident was the negligence of Haggett, and that even if it be assumed, for the sake of argument, that the defendant was negligent with respect to its water pipe, still that negligence was remote and that of Haggett was the proximate cause of the accident. There may be more than one proximate cause concurring to produce an injury. *Woodcock's Admr.* v. *Hallock, supra,* at page 289; *Town of Sharon* v. *Anahama Realty Co.,* 97 Vt. 336, 123 Atl. 192; *Hunter* v. *Preston et al.,* 105 Vt. 327, 336, 166 Atl. 17; *Spinney's Admr.* v. *Hooker & Son,* 92 Vt. 146, 155, 102 Atl. 53; *Blanchard* v. *Vermont Shade Roller Co.,* 84 Vt. 442, 447, 79 Atl. 911. From the evidence to which we have already referred it seems clear that the jury, even though they found that Haggett was guilty of negligence, might also find that the accident would not have occurred except for the failure of the defendant to exercise the care and prudence of a prudent man in allowing water to continue to escape and form ice upon the highway.

The case of *Ford* v. *Braintree,* 64 Vt. 144, 23 Atl. 633, upon which the defendant relies, is not decisive of the question of negligence here. That case, like the later culvert and bridge cases, turns upon the application of the statute under which the suit was brought to the facts of the particular case. *Mobus* v. *Waitsfield,* 75 Vt. 122, 53 Atl. 775; *Widham* v. *Brattleboro,* 105 Vt. 210, 166 Atl. 22; *Zeno's Bakery* v. *State,* 105 Vt. 370, 166 Atl. 379. It is said in *Town of Sharon* v. *Anahama Realty Co.,* 97 Vt. 336, 338, 123 Atl. 192: "Whenever the separate and independent acts or negligence of several persons, by concurrence, produce a single and indivisible injury which would not have occurred without such concurrence, each is responsible for the

entire result, and they may be sued jointly or severally, at the election of the party injured. In such cases, the act or neglect of each is a proximate and an efficient cause, and when several proximate causes contribute to an injury and each is an efficient cause, without the operation of which the injury would not have been caused, it may be attributed to any or all of such causes. This has come to be the established doctrine of this Court.'' See, also, the fully analyzed opinion by Rowell, J., to the same effect in *Drown* v. *N. E. Tel. & Tel. Co. et al.*, 80 Vt. 1, 11, 66 Atl. 801; *Hunter* v. *Preston et al., supra; Coldwell* v. *Lang,* 105 Vt. 359, 166 Atl. 10.

 Defendant contends also that the negligence of Haggett was an intervening independent and efficient cause of the accident which rendered the claimed negligence of the defendant a remote rather than a proximate cause of the injury and in support of this contention it quotes the law as stated in *Beatty* v. *Dunn et al.*, 103 Vt. 340, 343, 154 Atl. 770, and as recently restated in *Bennett* v. *Robertson, supra,* which reads, omitting the authorities originally cited, as follows: ''When negligence is established, liability attaches for all the injurious consequences that flow therefrom until diverted by the intervention of some efficient cause that makes the injury its own, or until the force set in motion by the negligent act has so far spent itself as to be too small for the law's notice. The difficulty in applying this rule often lies in determining what is an 'intervening cause' therein referred to. The answer to this question is to be found in the character of the intervening *act.* * * * If this, itself, is a 'natural and proper result of the original negligence, it will not necessarily prevent a recovery thereon.' Otherwise it will. Such an efficient intervening cause, in order to stand as the responsible cause of the ultimate result, must be a new and independent force or agency breaking the chain of causal connection between the original wrong and that result. If that result is merely accelerated by the new cause, the chain is not broken. Thus it is that the negligence of a third person may or may not amount to an efficient intervening cause. If it is something that, in the eye of the law, the person charged was bound to anticipate, the causal connection is not broken; otherwise the chain of causation is broken.'' We think that the intervening act—if such it was— of Haggett in coming upon the ice and there losing control of

his car would be a ''natural and proper result'' of the failure of the village to prevent water from escaping and forming ice upon the pavement. The village was bound to anticipate that motor vehicles would use the street, that pedestrians, including small children, might cross at or near that point and that a collision might follow as a result of the ice, even though negligence of the driver, prior to coming upon the ice, might be a contributing factor. As previously suggested, the evidence was sufficient to support a finding that the driver might have averted the accident notwithstanding his own negligence had it not been for the ice. The chain of causation to the original neglect was not broken, nor had the force set in motion thereby so far spent itself as to become too small for the law's notice. There was no error in overruling the defendant's motions.

*Judgment affirmed.*